UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| MARK PICOZZI,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>STATE OF NEVADA *et. al*,<br><br>　　　　　Defendants. | Case No. 2:20-cv-00518-RFB-MDC<br><br>**ORDER** |

Before the Court are several motions for miscellaneous relief (ECF Nos. 209, 210, 214, 212, 216, 228, 230, 241, 245, 246, 248, 265) as well as Plaintiff Mark Picozzi's motions for coercive and compensatory sanctions (ECF Nos. 211, 215). For the following reasons, the Court grants Plaintiff's motions for sanctions in part. The Court denies the remaining motions.

**I.    BACKGROUND**

Plaintiff Mark Picozzi is incarcerated in the custody of the Nevada Department of Corrections ("NDOC") at High Desert State Prison ("HDSP"). On June 26, 2022, the Court issued its Screening Order, permitting Plaintiff's First Amendment free exercise and RLUIPA violations to proceed against Defendants Williams, Johnson, Nash, Kuloloia, Barrett, Silber, Calderon, Wilson, Oliver, Bean, Fowler, and Barth. ECF No. 134. In the Second Amended Complaint, Plaintiff alleges that he is, and has been, Catholic his entire life. ECF No. 124 at 4. Since 2017, Plaintiff alleges that he has filed numerous inmate request forms to receive ashes for Ash Wednesday, a no meat diet during Lent, and to receive palms for Palm Sunday. Id. For five years, the Chaplain has never honored these requests. Id.

On January 19, 2024, the Court held a hearing on Defendants' Motion to Dismiss the

Amended Complaint. The Court granted the Motion in part and denied it in part, permitting Plaintiff's First Amendment free exercise and RLUIPA claims to proceed based only on alleged violations that occurred in 2019 and any year thereafter. ECF No. 199. On January 29, 2024, Plaintiff filed his Priority Review Motion for Ashes on Ash Wednesday. ECF No. 197. The Court construed this motion as a Motion for Temporary Restraining Order ("TRO") and Motion for Preliminary Injunction. The Court ordered NDOC to respond by February 7, 2024. ECF No. 200. NDOC filed their Response on February 7, 2024. ECF No. 201. On February 14, 2024, the Court granted a TRO. ECF No. 204. On February 27, 2024, the Court held a hearing on the preliminary injunction. ECF No. 213. The Court held a second hearing on March 18, 2024 in order to determine whether a preliminary injunction should issue and to determine whether Defendants were in compliance with the Court's TRO (ECF No. 204).

At the March 18, 2024 hearing, the Court heard testimony from seven witnesses, including Plaintiff. The Court granted Defendants' request for an extension of time to respond to Plaintiff's motion for sanctions. The Court also ordered Plaintiff to file a supplement to his motions for sanctions, detailing the number of hours spent seeking enforcement of the Court's Temporary Restraining Order for the period between February 14, 2024, and February 28, 2024. ECF No. 236. The Court also ordered Plaintiff to include a description of any other expenditures that Plaintiff believed were made necessary by Defendants alleged failure to provide Plaintiff with an appropriate diet, including, but not limited to, the costs of mail, making copies, and purchase of alternative food. Id. Plaintiff filed his supplement on March 20, 2024. ECF No. 237. Plaintiff filed a second supplement on March 26, 2024. ECF No. 240. Defendants responded to the motions for sanctions, as well as Plaintiffs' supplements, on March 29, 2024. ECF No. 243. Plaintiff filed a reply on April 4, 2024. ECF No. 247. This Order follows.

**II.   LEGAL STANDARD**

"Civil contempt . . . consists of a party's disobedience to a specific and definite court order by failure to take all reasonable steps within the party's power to comply." Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y, 774 F.3d 935, 945 (9th Cir. 2014). To establish a *prima facie* case of civil contempt, the moving party must show by clear and convincing evidence that the

defendant (1) violated a court order, (2) beyond substantial compliance, and (3) not based on a good faith and reasonable interpretation of the order. Labor/Cmty. Strategy Ctr. v. Los Angeles County Metro. Transp. Auth., 564 F.3d 1115, 1123 (9th Cir. 2009) (citing In re Dual-Deck Video Cassette Recorder Antitrust Litig., 10 F.3d 693, 695 (9th Cir. 1993)). "The contempt 'need not be willful' and there is no good faith exception to the requirement of obedience of a court order." Dual-Deck, 10 F.3d at 695 (citing In re Crystal Palace Gambling Hall, Inc., 817 F.2d 1361, 1363 (9th Cir. 1987)). "'Substantial compliance' with the court order is a defense to civil contempt, and is not vitiated by 'a few technical violations' where every reasonable effort has been made to comply." Id. Once the moving party establishes a *prima facie* case of contempt, the defendant bears the burden of showing "categorically and in detail" why he is unable to comply. N.L.R.B. v. Trans Ocean Export Packing, Inc., 473 F.2d 612, 616 (9th Cir. 1973).

### III. FACTUAL FINDINGS

The Court makes the following factual findings based on the testimony presented at the evidentiary hearings and the exhibits received into evidence.

The Court issued its Temporary Restraining Order shortly before 3 p.m. on February 14, 2024. It ordered Defendants to "immediately make a meatless diet available to Plaintiff for all meals." The TRO explained that it would "remain in force for the earlier of 14 days or until the Court issues a ruling on Plaintiff's pending Motion for a Preliminary Injunction." Less than 30 minutes after the injunction issued, the Deputy Attorney General sent HDSP leadership, including Warden Jeremy Bean and Anthony Quillmann, an email containing the TRO and explained, "[p]ursuant to the court's order please place Picozzi on a vegan or vegetarian diet as soon as possible." Id. Jeremy Bean is the Warden of HDSP and oversees the management of the prison. Mr. Quillmann is the Acting Food Service Manager for the entire prison and oversees the daily operations of the culinary as well as the training of inmates and staff as it relates to their jobs in culinary.

Mr. Quillmann designated Plaintiff to receive a "No Meat Diet" beginning February 15, 2024 through the prison's Notice system and Pre-Breakfast Reports. However, it is common and known by NDOC staff that inmates receive the wrong meal by mistake, even if they are designated to

receive a certain meal plan through the Pre-Breakfast Report. In the past, there have been "issues and litigation" related to vegan meals being improperly made. ECF No. 219-1 at 142. NDOC staff, including Mr. Quillmann, know that HDSP has not set up or attempted to set up any system to track whether Plaintiff (or any other prisoner) is actually receiving their designated meals.

Mr. Quillmann declared under penalty of perjury on February 26, 2024, while the TRO was still in effect, that HDSP was in full compliance with the TRO and Plaintiff would be receiving vegan meals indefinitely until otherwise notified by the Court. See ECF No. 207-1 ("Picozzi has received meatless trays since February 14, 2024, up to the date of this declaration.").

In spite of the Court's order and Mr. Quillmann's declaration, the record establishes that Plaintiff received meals with meat in them for one or more of his meals on the following days: February 16, 2024; February 17, 2024; February 18, 2024; February 19, 2024; February 20, 2024; February 22, 2024; February 25, 2024; February 26, 2024; February 27, 2024; and February 28, 2024. Plaintiff received a vegan meal on only three of the fourteen days that the TRO was in effect: February 21, February 23, and February 24, 2024.

In addition to being served meat, Plaintiff sought and was denied a vegan meal tray or accommodation on several occasions.

### a. February 16-18

On February 16, 2024, Plaintiff filed an emergency grievance because his meal contained meat. He was told by staff that they could not rectify his meal plan until the next business day, Monday, February 19. Plaintiff could not accommodate himself because the inmates in Plaintiff's unit, Unit 12-D, were served bologna for lunch on that day.[1] Meat was also a component of the main dish in at least one meal on both Saturday and Sunday. Plaintiff had no choice but to eat his double portion meals on Friday, February 16, 2024, and over that weekend, on February 17 and 18, because of his medications.[2]

---

[1] This is despite Defendants' original representation to this Court that the main menu was to be meatless on Ash Wednesday and each Friday during Lent.

[2] Plaintiff requires a higher level of daily calories for his medications and he was medically prescribed a double portion meal for this reason.

- 4 -

### b. February 27

On February 27, 2024, Sergeant Dvorak gave Plaintiff a sack lunch with bologna in it when he returned to HDSP after the Court's first preliminary injunction hearing. When Plaintiff told Dvorak about the order, he responded, "that's all I have, take it or don't eat." Plaintiff did not take the sack lunch and went to his unit where he informed Officers Fontes, Brightwell, and White that he did not receive a lunch. However, none of them called for a meal.

### c. February 28

On February 28, 2024, Plaintiff filed a second emergency grievance because he again received meat in his tray. Sergeant Clayton responded to the grievance and called culinary to have them send a no meat sack to Plaintiff. No vegan meal arrived.

Though Sergeant Clayton attempted to accommodate Plaintiff on at least one occasion, February 28, 2024, when Plaintiff notified him about not receiving a vegan tray, Sergeant Clayton never followed up to ensure that the vegan meals went out to Plaintiff. Sergeant Clayton oversees four units. Both Warden Bean and Mr. Quillmann also failed to do any follow-up with the culinary officers or porters to find out if Plaintiff was receiving his court-ordered meals, despite it being known that such meals were not regularly being given to Plaintiff.

Plaintiff filed two emergency grievances with respect to receiving the wrong meal. Mr. Quillmann was aware of these grievances as he normally receives copies of grievances related to individuals being provided improper meals. Quillmann deliberately took no further action to ensure compliance with the TRO until Plaintiff made the Court aware that the TRO was not being followed on February 27, 2024.

Plaintiff also made at least seven different staff, including Officers Hill, Brightwell, Baker, Fontes, White, Sergeant Clayton and Sergeant Duvak, aware of the fact that he was not receiving the proper meal pursuant to the Court's order. Sergeant Clayton came to Plaintiff's cell "quite a few times" to talk to Plaintiff about his diets and, as noted, made a call to culinary on at least one occasion. Plaintiff also informed Mr. Fudge, a porter for Plaintiff's unit who is also employed by culinary, about the meatless diet as well.

Daily Meal Reports are signed by culinary staff and should indicate when substitutions are

made and for what reason. However, HDSP frequently makes substitutions that are not reflected in the Daily Meal Reports. For example, all inmates who attended the hearing on March 18, 2024, including Plaintiff and three inmate porter witnesses, received a bologna sandwich for lunch even though the signed Daily Meal Report stated that all inmates received a peanut butter and jelly sandwich for lunch on that day. This type of error is common and known to HDSP staff who have taken no steps to remedy it.

The Court finds Plaintiff's testimony to be credible. Indeed, Sergeant Clayton himself could not remember any time where Plaintiff was untruthful with him or withheld documentation.

### IV. Discussion – Motion for Sanctions

Plaintiff moves for coercive and compensatory sanctions for Defendants' non-compliance with the Court's February 14, 2024 TRO. Defendants argue that the TRO's language only ordered Defendants to immediately make a meatless diet available to Plaintiff but did not specify how Defendants should cause that to happen. According to Defendants, Plaintiff must establish by clear and convincing evidence that a meatless diet was not made available in any form, which he has failed to do. Defendants alternatively argue that HDSP staff substantially complied with the TRO because Sergeant Clayton testified that he would accommodate Plaintiff whenever Plaintiff contacted him about not receiving a vegan tray. Defendants also assert that Plaintiff's testimony lacks credibility as there are discrepancies between his testimony and the Daily Meal Reports.

#### a. Substitution of Defendants

Where a state official is being sued in his official capacity, Rule 25(d) provides that they shall automatically be substituted by their successor when they are separated from their office. See Fed. R. Civ. P. 25(d). No consequences follow from a failure to enter a substitution order. Because Plaintiff seeks monetary damages as well as prospective injunctive relief (through RLUIPA), the Court construes Plaintiff's complaint as suing the named Defendants in both their individual and official capacities. See Mitchell v. Washington, 818 F.3d 436, 442 (9th Cir. 2016) (stating that in situations where a *pro se* plaintiff's complaint against a state official seeks damages but fails to select whether the action is an "individual" or "official" capacity suit, the court may presume personal-capacity because an official-capacity suit for damages would be barred); Ex Parte Young,

209 U.S. 123 (1908) (finding that the Eleventh Amendment does not bar suits for prospective injunctive relief filed against state officials); Wood v. Yordy, 753 F.3d 899 (9th Cir. 2014) (holding that RLUIPA claims may not be brought against state prison officials in their individual capacity). Anthony Quillmann, in his official capacity as Acting Food Service Manager at High Desert State Prison, has therefore been automatically substituted for Duane Wilson in his official capacity only. See Leer v. Murphy, 844 F.2d 628, 631-32 (9th Cir. 1988) (finding claims against prison correctional officer, warden, and other officials in official capacity to be claims against the State). Jeremy Bean, in his official capacity as Warden of High Desert State Prison, is substituted for Brian Williams in his official capacity. Duane Wilson and Brian Williams remain Defendants in their personal capacity only. In addition to being sued in his official capacity as Warden, Jeremy Bean also remains a Defendant in his personal capacity.[3]

### b. The TRO Was Violated

The Court finds that Plaintiff has established by clear and convincing evidence that the Court's order, which was in effect from February 14, 2024 through February 28, 2024, was violated. The TRO was issued shortly before 3 p.m. on February 14, 2024. It ordered Defendants to "immediately make a meatless diet available to Plaintiff for all meals." The TRO explained that it would "remain in force for the earlier of 14 days or until the Court issues a ruling on Plaintiff's pending Motion for a Preliminary Injunction." Less than 30 minutes after the injunction issued, the Deputy Attorney General sent HDSP leadership an email containing the TRO and explained, "[p]ursuant to the court's order please place Picozzi on a vegan or vegetarian diet as soon as possible." Defendants concede that the order was specific and definite.

In spite of the Order's unambiguous command, Plaintiff received meals with meat in them for one or more of his meals on the following days: February 16, 2024; February 17, 2024; February 18, 2024; February 19, 2024; February 20, 2024; February 22, 2024; February 25, 2024; February 26, 2024; February 27, 2024; and February 28, 2024. Plaintiff received a vegan meal on only three of the fourteen days that the TRO was in effect: February 21, February 23, and February

---

[3] Jeremy Bean is one of the originally named Defendants that survived screening. However, he had not yet been promoted to Warden at the time the complaint was filed.

24, 2024.

Defendants argue that Plaintiff has failed to satisfy his burden because the TRO only required Defendants to make the meatless diet *available* and Plaintiff does not identify specific dates where he sought and was denied a vegan tray or accommodation from the line. The Court disagrees. At a minimum, as described in the Court's factual findings, Plaintiff sought and was denied a vegan meal tray or accommodation on February 16, February 17, February 18, February 27, and February 28. Therefore, that the TRO did not specify *how* Plaintiff was to receive his meals is irrelevant because Plaintiff has established by clear and convincing evidence that a meatless diet was unavailable to him.

The Court also rejects Defendants' argument that Plaintiff must show that he could not have accommodated himself with meatless items from the main menu for his meals. First, no TRO would have been necessary in the first place had Plaintiff been able to accommodate himself with meatless items from the main menu. Second, it is well established that prisons must "provide inmates with food sufficient to sustain them in good health and satisfies the dietary laws of their religion." McElyea v. Babbitt, 833 F.2d 196 (9th Cir. 1987). The term "meatless diet" therefore meant a meatless diet sufficient to sustain Plaintiff in good health. Defendants' view that they were permitted to continue to serve Plaintiff the main menu so long as there were vegetarian sides available is not a good faith or reasonable interpretation of its order.[4] Sea Shepherd, 774 F.3d at 949 ("In deciding whether an injunction has been violated it is proper to observe the objects for which the relief was granted and to find a breach of the decree in a violation of the spirit of the injunction, even though its strict letter may not have been disregarded.") (internal quotation marks and citation omitted).

Finally, if there was any ambiguity in the Order, Defendants had every opportunity to seek clarification from the Court. They did not. Id. (noting that defendants "acted at their peril" "when they undertook to make their own determination of what the decree meant."). Instead, Defendants'

---

[4] Plaintiff has also credibly testified that he requires a higher level of daily calories for his medications and he was medically prescribed a double portion meal for this reason. It follows that Plaintiff would be forced to eat far less than an amount sufficient to sustain him in good health if he could only eat the side portions of a meal where the main offering was meat.

own emails, pleadings, and declarations all indicate that they understood the Court's order to mean that Plaintiff was to be placed on a "vegan or vegetarian diet;" not the main menu. See ECF No. 219-1 at 27 ("Pursuant to the court's order please place Picozzi on a vegan or vegetarian diet as soon as possible."); ECF No. 207 ("Mr. Quillmann declares that Picozzi has been placed on a vegan lifestyle diet effective February 14, 2024, and will remain on this diet indefinitely subject to the court's further order.").

The Court further finds that Plaintiff's testimony is credible. Sergeant Clayton testified that he could not remember any time where Plaintiff was untruthful with him or withheld documentation. Defendants argue that Plaintiff lacks credibility because his allegations are inconsistent with the Daily Meal Reports. The record establishes that these Reports are (and are known to be) consistently inaccurate. Moreover, although Plaintiff's accounts of his meals are inconsistent with the Daily Meal Reports on certain days, Plaintiff credibly testified that HDSP frequently makes substitutions even if these substitutions are not recorded. This was corroborated by the sworn testimony of three different inmate porters who stated that they each received a bologna sandwich for lunch on March 18, 2024, even though the signed Daily Meal Report states that all inmates received a peanut butter and jelly sandwich for lunch on that day. Defendants attempt to discredit all four witnesses' testimony on this point. Defendants assert that these witnesses "mislead the Court" and maintain that Plaintiff and all three porters did not eat bologna for lunch on March 18. The Court is unpersuaded and finds that the Daily Meal Reports are not a reliable record of what was in fact served on any given day and that HDSP staff knew this and did nothing about it.

### i. <u>Substantial Compliance</u>

Defendants alternatively argue that they substantially complied with the TRO. "A contemnor in violation of a court order may avoid a finding of civil contempt only by showing it took all reasonable steps to comply with the order." Kelly v. Wengler, 822 F.3d 1085, 1096 (9th Cir. 2016) (citing Sea Shepherd, 774 F.3d at 945). Defendants assert that they substantially complied because "a meatless meal was still made available." The Court has already rejected this argument and found that there was no meatless diet available to Plaintiff for one or more meals on

at least five days and that Plaintiff was knowingly served a meat diet on several days. Defendants reference Sergeant Clayton's testimony, who stated that he would accommodate Plaintiff whenever Plaintiff notified him about not receiving a vegan tray, either by contacting culinary to have a new tray delivered or accommodating him with meatless items off the main menu. But Sergeant Clayton also testified that he never actually checked that the vegan meals went out to Plaintiff. This is corroborated by the fact that no vegan tray went out to Picozzi on February 16, 2024, even after Clayton put in a request for it. Moreover, Defendants improperly assume that Plaintiff could speak with Sergeant Clayton during every single mealtime. Sergeant Clayton attested that he oversees four units and Plaintiff's filings and testimony recount communications with multiple other officers on different days, strongly suggesting that Clayton was not always available.

The Court therefore finds clear and convincing evidence that Defendants did not make "every reasonable effort" to assure compliance with the Temporary Restraining Order, and therefore Defendants did not substantially comply. In re Dual–Deck, 10 F.3d at 695. Consequently, the burden shifted to Defendants to show "categorically and in detail" why they were unable to ensure that Plaintiff received his meatless meals as required by this Court's order. See Donovan, 716 F.2d at 1240. Defendants do not attempt to meet this burden.

    **c. Defendants' Contempt Liability**

Having established that the Court's order was violated, the Court now considers which parties should be held liable for civil contempt. "The law is clear that those who control an organization may be held liable if they fail to take appropriate action to ensure compliance with an injunction." Sea Shepherd Conservation Soc'y, 774 F.3d at 955. Jeremy Bean is the Warden of HDSP and oversees the management of the prison. Mr. Quillmann is the Acting Food Service Manager for the entire prison and oversees the daily operations of the culinary as well as the training of inmates and staff as it relates to their jobs in culinary. There is no dispute that both Warden Bean and Mr. Quillmann were on notice of the Court's injunction. Soon after the injunction issued, the Deputy Attorney General emailed the Court's order to HDSP leadership, including Warden Bean and Mr. Quillman. ECF No. 219-1 at 27. For the reasons stated above, the

Court finds clear and convincing evidence that Warden Bean and Mr. Quillmann, as leaders of HDSP and HDSP's culinary, failed to take all reasonable steps to comply with the Court's February 14, 2024 injunction, such as a basic follow up with the culinary officers or porters to find out if Plaintiff was receiving his court-ordered meals. The Court therefore holds Warden Bean and Mr. Quillmann in civil contempt.

### d. Sanctions

Courts have "broad equitable power to order appropriate relief in civil contempt proceedings." SEC v. Hickey, 322 F.3d 1123, 1128 (9th Cir. 2003). "A court may wield its civil contempt powers for two separate and independent purposes: (1) 'to coerce the defendant into compliance with the court's order'"; and (2) "to compensate the complainant for losses sustained.'" Shell Offshore Inc. v. Greenpeace, Inc., 815 F.3d 623, 629 (9th Cir. 2016). Compensatory sanctions are used to "compensate a party who has suffered unnecessary injuries or costs because of contemptuous conduct," Shell, 815 F.3d at 629, and are thus payable to the Plaintiff. They must be based on "actual losses sustained as a result of the contumacy." Shuffler v. Heritage Bank, 720 F.2d 1141, 1148 (9th Cir. 1983). This includes the cost of bringing the violation to the attention of the court. This is "part of the damages suffered by the prevailing party and those costs would reduce any benefits gained by the prevailing party from the court's violated order." Sea Shepherd Conservation Soc'y, 774 F.3d at 958.

Defendants argue that coercive sanctions are inappropriate because there is presently no need to coerce compliance with a TRO that expired on February 28, 2024. Defendants also argue that Plaintiff is not entitled to attorney's fees because he is a non-attorney appearing *pro se*. Defendants contest Plaintiff's request for reimbursement of the $402 filing fee, the cost of a food package ordered on February 28, 2024 for $135.79, two $50 deposits from his parents, and postage in the amount of $7.70 to file three documents. Finally, Defendants state that Plaintiff has failed to identify any compensable costs or injuries attributable to a violation of the Court's order and therefore any sanctions would exceed the scope of civil contempt. Based on its review of the filings, the Court finds that the imposition of compensatory civil contempt sanctions is appropriate

and will address each argument in turn.[5]

### i. Compensable Costs

*Pro se* prisoners may not recover an award of attorney's fees as the "prevailing party" under 42 U.S.C. § 1988, Gonzalez v. Kangas, 814 F.2d 1411, 1412 (9th Cir. 1987); Kay v. Ehrler, 499 U.S. 432, 438 (1991). However, several courts within the Ninth Circuit have found that "[f]ees to pro se litigants are awardable under the court's inherent power." Surowiec v. Cap. Title Agency, Inc., 790 F. Supp. 2d 997, 1011 (D. Ariz. 2011); Shorter v. Baca, No. 2:12-07337-DOC, 2023 WL 5170126, at *4 (C.D. Cal. July 27, 2023); Laughlin v. C.I.R., 117 F. Supp. 2d 997, 1002 (S.D. Cal. 2000); Browning v. Lilien, No. 15CV2208-GPC (BLM), 2016 WL 4917115, at *6 (S.D. Cal. Sept. 15, 2016); Brown v. Stroud, No. C-08-02348 JSW DMR, 2012 WL 2709058, at *8 (N.D. Cal. July 6, 2012); Leverty & Assocs. L. Chtd v. Exley, No. 3:17-cv-00175-MMD-WGC, 2018 WL 6728415, at *10 (D. Nev. Nov. 5, 2018), Pickholtz, 284 F.2d at 1377 (holding that failure to allow recovery of sanctions "would place a pro se litigant at the mercy of an opponent who might engage in otherwise sanctionable conduct").

When acting under its inherent authority to impose a sanction, a district court must find either: (1) a willful violation of a court order; or (2) bad faith. Am. Unites for Kids v. Rousseau, 985 F.3d 1075, 1088 (9th Cir. 2021). A "'willful' violation of a court order does not require proof of mental intent such as bad faith or an improper motive, but rather, it is enough that a party acted deliberately." Id. at 1090. "When only civil procedures are used, the sanction may go no further than to redress the wronged party 'for losses sustained' and may not impose any additional consequence as punishment for the sanctioned party's misbehavior." Id. at 1089. The Court is to undertake a "granular inquiry" and apply a "but for" causation standard. Id. In other words, a sanction "must be limited to compensating for the specific harm" caused by the misconduct. Id.

The Court finds that Mr. Quillmann acted willfully in failing to comply with the Court's order. Mr. Quillmann designated Plaintiff to receive a "No Meat Diet" beginning February 15,

---

[5] Because the TRO expired on February 28, 2024, and is therefore no longer in effect, the Court finds that coercive sanctions are not appropriate at this time. See Shell Offshore Inc., 815 F.3d at 630 ("'A court's power to impose coercive civil contempt depends upon the ability of the contemnor to comply with the court's coercive order,' something which may change over time.") (citation omitted).

2024 through the prison's Notice system and Pre-Breakfast Reports. However, the Court finds that Quillmann knew that it was common for inmates to receive the wrong meal by mistake, even if they are designated to receive a certain meal plan through the Pre-Breakfast Report. And Mr. Quillmann's email, dated February 14, 2024, establishes that there have been past "issues and litigation" related to vegan meals being improperly made. It was therefore highly foreseeable that the Court's order would not be followed without verification. In spite of this knowledge, Quillmann deliberately took no action to ensure compliance with the TRO until Plaintiff made the Court aware that the TRO was not being followed on February 27, 2024. The Court also finds it highly relevant that Mr. Quillmann declared, under penalty of perjury, on February 26, 2024, while the TRO was still in effect, that HDSP was in full compliance with the TRO and Plaintiff would be receiving vegan meals indefinitely until otherwise notified by the Court. See ECF No. 207-1 ("Picozzi has received meatless trays since February 14, 2024, up to the date of this declaration."). This declaration was an attempt to evade enforcement of the Court's TRO as well as a subsequent preliminary injunction by mooting the issue. Yet Mr. Quillmann admitted at the hearing that neither he or anyone else at HDSP had the ability to track whether Plaintiff (or any other prisoner) was actually receiving their designated meals and that he never attempted to do so. Thus, Mr. Quillmann made this statement without factual basis for its content.

Further, though Mr. Quillmann testified that he was never informed about Plaintiff's grievances or other complaints to staff, the Court does not credit this testimony. Mr. Quillmann stated that he normally receives copies of grievances related to individuals not receiving the proper meal and it is undisputed that Plaintiff filed two emergency grievances with respect to receiving the wrong meal. Based on the filings and testimony, the Court finds that Plaintiff also made at least seven different staff, including Officers Hill, Brightwell, Baker, Fontes, and White, and Sergeant Clayton and Sergeant Duvak, aware of the fact that he was not receiving the proper meal pursuant to the Court's order. Sergeant Clayton testified that he came to Plaintiff's cell "quite a few times" to talk to Plaintiff about his diets and also made a call to culinary on at least one occasion. Mr. Fudge, a porter for Plaintiff's unit, who is also employed by culinary, was informed by Plaintiff about the meatless diet as well. Mr. Quillmann knew Plaintiff was not receiving his court-ordered

meals and deliberated failed to remedy the issue.

Having found that Mr. Quillmann willfully violated the Court's order, the Court has reviewed Plaintiff's supplement and finds it appropriate for Quillmann to compensate Plaintiff's reasonable costs and fees arising from Defendant Quillmann's sanctionable misconduct.

At the Court's direction, Plaintiff provided a detailed accounting of the time he spent researching and writing the two motions for sanctions. Plaintiff asserts that from February 15, 2024 through February 19, 2024, Plaintiff spent 38 hours researching, reading case law, and writing the motion for sanctions. He mailed the motion on February 19, 2024. Between February 20, 2024 and February 26, 2024, he continued to do legal research. On February 27, 2024, when Plaintiff attended the first preliminary injunction hearing, he learned that the Court had not received his motion for sanctions that was mailed on February 19, 2024. He then spent 12 hours researching and re-writing the motion for sanctions on February 28 and another 8-11 hours re-writing the motion on February 29, 2024. In total, Plaintiff states he spent approximately 103 hours on this work. Defendants do not object to the number of hours.

The Court finds that the 38 hours Plaintiff spent on researching and writing the motion for sanctions between February 15 and February 19, 2024 is directly related to the sanctionable misconduct in this case. The Court further finds it appropriate to compensate Plaintiff for the 12 hours he spent on February 28, 2024 researching and re-writing the motion for sanctions. Through no fault of his own, Plaintiff's original motion was never filed with the Court and without Plaintiff's undertaking to re-write the motion, there would be no motion for sanctions to consider.

However, the Court will not compensate Plaintiff for the time he spent doing undisclosed research between February 20 and February 27, 2024. At this point in time, Plaintiff was under the impression that his motion had been filed with the Court and it is therefore unclear what purpose this research served or how the Defendants' misconduct was related to it. The Court also declines to compensate Plaintiff for the 8-11 hours he spent on February 29, 2024 finishing the re-write because the motion for sanctions was dated February 28, 2024. Finally, the Court will not compensate Plaintiff for the 9 to 11 hours that he spent on the separate "Motion to Stop Retaliation" because the TRO only circumscribed the religious diet that Plaintiff was to receive. Plaintiff's

work on the retaliation motion is therefore unrelated to the violation of the court order. In sum, the Court finds that but for Defendant's sanctionable misconduct, Plaintiff would not have incurred 50 hours of work related to filing the motion for civil sanctions.

Attorney's fees are generally calculated by the "lodestar" method, whereby a court multiplies the number of hours the prevailing party "reasonably expended on the litigation by a reasonable hourly rate for the region and for the experience of the lawyer." In re Bluetooth Headset Prods. Liab. Litig., 654 F.3d 935, 941 (9th Cir. 2011). Plaintiff is proceeding *pro se* and is therefore not well versed in the relevant legal authority or motions practice. The Court finds that he reasonably spent 50 hours researching and writing the motions for sanctions, and then re-writing it once he realized it had not been filed.

Plaintiff seeks $60 per hour for this work, which is well below the average hourly rate for licensed attorneys in Las Vegas. See, e.g., Liberty Media Holdings, LLC v. FF Magnat Ltd., No. 2:12-cv-01057-GMN-RJJ, 2012 WL 3834744, at *2 (D. Nev. Sep. 4, 2012) (recognizing "$400-$500 per hour for partners ... $325 per hour for associate attorneys" was "reasonable rates in the Las Vegas legal market"). It is also lower than the hourly rate courts have found to be reasonable for second-year law students. See Kelly v. Wengler, 7 F. Supp. 3d 1069, 1075 (D. Idaho 2018) (finding $65 per hour was reasonable hourly rate for second-year law student). Defendants also do not object to the hourly rate proposed by Plaintiff. The Court therefore finds $60 to be a reasonable hourly rate. Accordingly, the Court will award Plaintiff sanctions in the amount of $3,000 (60 x 50). Because the award is against Defendant Quillmann in his official capacity, it will be paid by the State. Williams v. Alioto, 625 F.2d 845, 849 (9th Cir. 1980).

      ii. **Non-Compensable Costs**

Plaintiff provides a receipt showing that his parents placed a food package order for him on February 28, 2024. Because this food order was placed on the last day of the TRO, the food was necessarily procured for Plaintiff to eat upon expiration of the TRO at which point, Defendants were no longer required by court order to make a particular meal available to Plaintiff. The Court therefore finds that there is an insufficient nexus between the harm and the February 28 food purchase. Similarly, the Court will not compensate Plaintiff for the two $50 deposits which were

made on February 29 and March 5, as both deposits were made after the expiration of the TRO, and thus could not be caused by the sanctionable misconduct. For this same reason, the food package that Plaintiff ordered in April of 2023, as well as the $402 filing fee required to institute the underlying litigation, are also not compensable. Finally, the Court agrees with Defendants that plaintiff's postage costs were unnecessary because prisoners are to electronically file their motions.

    e.  **Request to Subpoena Ms. Garcia**

Separately, Plaintiff filed a motion for the Court to subpoena a non-party witness, Ms. Lisa Marie Garcia, and hold a hearing at which Ms. Garcia is to testify. Ms. Garcia was the Law Library Supervisor at HDSP in 2022. Plaintiff attaches a Declaration signed by Mr. Garcia on July 18, 2022. In this Declaration, Ms. Garcia attests that she discovered hidden documents belonging to Plaintiff in the drawers of the former Law Library Supervisor, Mr. Graham. These documents included Inmate Request Forms (Kites), Law Library Appointment Request Forms, Submission of Documents for E-Filing, Inmate Account Transaction Requests, NDOC library case law/research material, Informal Grievances, First Level Grievances, Second Level Grievances, and Continuation Forms attached to those grievances. None of these documents had been processed or given back to Plaintiff. These documents were dated 2018 through 2022 and pertained to Plaintiff's *habeas corpus* case as well as this instant civil rights litigation, 2:20-cv-518-RFB-MDC. Plaintiff previously filed the Garcia Declaration as an attachment to his reply in support of a prior motion for injunctive relief on July 18, 2022. ECF No. 142 at 12-16.

While the Court finds that Garcia's Declaration is relevant to Defendants' affirmative defense of exhaustion with respect to Plaintiff's underlying complaint, the Court does not find her testimony to be relevant to the instant dispute over whether the Court's TRO was followed. The Court therefore denies Plaintiff's request to re-open the evidentiary hearing for this testimony.

To the extent Plaintiff is filing as a motion for a deposition subpoena, the Court denies the motion without prejudice in light of the Court's recent grant of Plaintiff's motion to appoint counsel. For the same reasons, the Court denies Plaintiff's two motions for a copy of the transcripts from the evidentiary hearings, as well as his additional motion for clarification on the transcripts, without prejudice. Counsel shall have leave to refile these motions upon appointment.

### V. Discussion – Remaining Motions

#### a. Motions to Stop Retaliation

Plaintiff has filed three motions to stop retaliation. ECF Nos. 209, 214, 246. Plaintiff alleges that Correctional Officers at HDSP have threatened retaliation against him if he continues to file grievances, including moving him to a different housing unit or administrative segregation. Plaintiff further alleges that Defendants are retaliating against him by continuing to serve him a vegan tray after the expiration of the Court's order and spitting in his food on Easter.

In the Ninth Circuit, in order to prevail on a claim for preliminary injunctive relief, such as the relief requested above, there must be a "sufficient nexus between the claims raised in a motion for injunctive relief and the claims set forth in the underlying complaint itself" such that "the preliminary injunction would grant relief of the same character as that which may be granted finally." Pac. Radiation Oncology, LLC v. Queen's Med. Ctr., 810 F.3d 631, 636 (9th Cir. 2015). In the absence of this, the district court lacks authority to grant the relief requested. Id.

The Court finds that Plaintiff's motions for retaliation do not have a relationship or nexus to the underlying complaint. The screening order allowed a single claim to proceed: Claim 1 regarding the Plaintiff's access to his desired religious activities on Ash Wednesday, Lent, and Palm Sunday. There are no claims for retaliation. "Though new assertions of misconduct might support additional claims against a defendant, they do not support preliminary injunctions entirely unrelated to the conduct asserted in the underlying complaint." Pac. Radiation Oncology, 810 F.3d at 636 (adopting the rule from Devose v. Herrington, 42 F.3d 470, 471 (8th Cir. 1994), which found that a "prisoner's motion for injunctive relief based on retaliation by prison officials was entirely different and separate from the underlying conduct challenged in the § 1983 action.").

#### b. Motion for Violation of the Court's Order

On April 2, 2024, Plaintiff filed a motion for violating the Court's order. ECF No. 245. Plaintiff alleges that he has continued to receive vegan meals even though the Court's order on the preliminary injunction stated that it was to be in effect until March 28, 2024. The Court's order only mandated that Plaintiff receive a meatless meal during Lent and was based on the Court's findings that Plaintiff's religious exercise was substantially burdened. The Order did not dictate

what meals Plaintiff was to receive once Lent ended. Therefore, Plaintiff does not allege a violation of the Court's order. To the extent Plaintiff is asserting that Defendants are retaliating against him by continuing to give him vegan meals, these claims are unrelated to his underlying complaint, and therefore the Court does not have authority to issue an injunction.

### c. Remaining Motions

Plaintiff filed a motion to require Defendants to submit a pre-breakfast report. ECF No. 216. Plaintiff also filed a motion to allow him to view the full, unredacted version of this report. Defendants filed the pre-breakfast reports under seal with the Court as instructed. ECF No. 219-1. Defendants permitted Plaintiff to review the sealed filing. The document on file with the Court and the version which Plaintiff reviewed contain the same redactions. The Court will permit Defendants to maintain the redactions in these reports because they contain sensitive information about other inmate's meal designations. These meal designations, including those that are medically prescribed, are both confidential and unrelated to Plaintiff's allegations. See, e.g., Hill v. Baker, No. 3:11-CV-00717, 2014 U.S. Dist. LEXIS 3794, at *4 (D. Nev. Jan. 13, 2014) (finding that medical privacy has qualified as a compelling reason for sealing records). Accordingly, ECF No. 216 and ECF No. 230 are denied.

Plaintiff's remaining motions are moot. ECF No. 210 is a motion to subpoena video from culinary. However, Julie Williams submitted a declaration explaining that this video is unavailable. ECF No. 212 is a notice regarding certain mail not being received by the Court. This notice does not seek any specific relief. Finally, ECF No. 228 is a motion for a transport order to the second preliminary injunction hearing. Plaintiff was transported to the second hearing as the Court had ordered. The Court therefore denies ECF Nos. 210, 212, and 228 as moot.

### VI. CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that the Clerk of Court is to substitute Anthony Quillmann, in his official capacity as Acting Food Service Manager at High Desert State Prison, for Duane Wilson in his official capacity only.

**IT IS FURTHER ORDERED** that the Clerk of Court is to substitute Jeremy Bean, in his official capacity as Warden of High Desert State Prison, for Brian Williams in his official capacity.

**IT IS FURTHER ORDERED** that Duane Wilson, Brian Williams, and Jeremy Bean shall remain Defendants in their personal capacity.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Sanctions (ECF No. 211, 215) is **GRANTED** in part. The Court holds Anthony Quillmann and Jeremy Bean in contempt for violating the Court's February 14, 2024 Order. Plaintiff shall be awarded and Anthony Quillmann shall be sanctioned in the amount of: **$3,000.**

**IT IS FURTHER ORDERED** that Anthony Quillmann shall pay this amount to Plaintiff within 30 days of the issuance of this Order.

**IT IS FURTHER ORDERED** that ECF Nos. 209, 214, 216, 230, 245, and 246 are **DENIED.**

**IT IS FURTHER ORDERED** that ECF Nos. 241, 248, and 265 are **DENIED** without prejudice with leave to refile upon appointment of Counsel.

**IT IS FURTHER ORDERED** that ECF Nos. 210, 212, and 228 are **DENIED** as **moot**.

**IT IS FURTHER ORDERED** that this matter is **STAYED** pending appointment of counsel.

**IT IS FURTHER ORDERED** that the parties shall file a joint status report in on or before **October 9, 2024** regarding the status of appointment of counsel.

**DATED:** September 29, 2024

_____
**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**